# UNITED STATES DISTRICT COURT

## DISTRICT OF SOUTH DAKOTA

## NORTHERN DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>**Plaintiff,**<br><br><br>**vs.**<br><br>**RIGOBERTO HERNANDEZ,**<br><br>**Defendant.** | **1:22-CR-10016-CBK**<br><br><br><br>**REPORT AND RECOMMENDATION FOR DISPOSITION OF MOTION TO SUPPRESS** |

In this possession with intent to distribute a controlled substance case, Rigoberto Hernandez seeks to suppress, on Fourth Amendment and exclusionary rule grounds, evidence and statements acquired from him and his vehicle following, and as a result of, a traffic stop. Because investigators had no probable cause (or reasonable suspicion) of a law violation to justify pulling Hernandez over, the suppression motion should be granted.

## BACKGROUND

On January 20, 2022, Brown County Sheriff's Office Investigators Wes Graff and Jon Lemke surveilled a residence in Aberdeen, South Dakota, and – through a course of events – arrested a male with outstanding warrants and for unlawfully possessing

controlled substances. After the arrest, the male disclosed who had been helping him sell drugs in the Aberdeen area, the type and color vehicle the person drove, and where that person stayed. The description, though incomplete, provided Graff and other officers with enough detail to identify the suspected drug dealer's address and vehicle.

At around 7:30 a.m. the next morning, January 21, 2022, Graff and Lemke sat in Graff's unmarked Tahoe, about two blocks away from the address, and waited. After about 30 to 45 minutes, they saw a black SUV, matching the description given, back out of the driveway. Graff and Lemke observed that the vehicle had no front or rear license plates. They "paralleled" the SUV, travelling east on a street one block to the north and arrived at an intersection perpendicular to the SUV's route of travel at 8:13 a.m. Graff, driving, and Lemke, in the passenger seat, waited in the Tahoe at the intersection. Graff and Lemke saw, from a block or two away, the SUV approaching them as it traveled eastward. Graff noticed a crack in the SUV's windshield. Lemke, who likewise had eyes on the SUV, did not see any windshield crack.

Graff turned left at the intersection and followed the SUV. As he did so, Lemke alerted Graff to the temporary license permit in the SUV's back window. After about two blocks, the SUV turned right into a Cenex gas station. The SUV just entered the Cenex lot as Graff, only a few seconds behind, rounded that same right turn and switched on his emergency lights. Graff stopped the SUV because it had no license plates and had a

cracked windshield.  The SUV came to a stop at a gas pump.  Graff and Lemke got out of the Tahoe and approached the SUV, finding Hernandez behind the wheel.

As other officers gathered at the scene, Graff escorted Hernandez to Graff's Tahoe for written warnings on the alleged license plate and windshield crack violations. Meanwhile, Officer Tom Barstad, a K9 handler with the Aberdeen Police Department, deployed his drug detection dog, Neko, who indicated to the presence of drugs in the SUV.  Hernandez was then detained and his SUV searched.  Inside it, Graff, Barstad, and Brandon Mills, a Brown County Sheriff's Deputy, found a handgun, marijuana, ecstasy pills, methamphetamine, and a glass jar of other pills containing suspected fentanyl. Mills also seized multiple wads of currency from Hernandez's person.  In a subsequent post-arrest interview, Hernandez made inculpatory statements, admitting that the marijuana and some pills were his.

Graff and Lemke both testified at the evidentiary hearing about their observations from the Tahoe in connection with the traffic stop.  Barstad also testified at the hearing. The Court received as evidence a portion of Barstad's body camera recording taken during the stop.  Barstad followed directly behind Graff and Lemke and arrived at the Cenex moments after they did.  The body camera recorded the two-block pursuit before Graff activated his emergency lights.

The camera footage shows that Hernandez did have presumably valid temporary vehicle license permits on display.  The front temporary permit was attached to the

bottom right hand (passenger) side of the windshield, and the rear permit at the bottom left hand (driver) side of the back window – right where they were supposed to be. The tint and light coating of dust slightly reduced the transparency of the rear window, but the rear wiper cleared the dust coating within its swath. About half of the temporary permit, attached to the interior of the window, was within that swath.

Camera footage also showed the front windshield condition. The crack on the windshield was a singular, lengthy crack, but was not tree-like or spiderwebbed. The crack extended from the lower driver's side of the window, upward in an angular fashion, and then rightward toward the center of the windshield with the apex being just over the steering wheel. From the footage, an outside viewer could only see the crack from distinct angles and not necessarily from a distant, head-on, or perpendicular vantage point.

## DISCUSSION

### A. Stop

Hernandez challenges the lawfulness of his traffic stop. He maintains that, from an objective standpoint and based on the evidence, the windshield crack did not significantly impair his view and the temporary permits were properly displayed, in contradiction with Graff's stated reasons for stopping him. Because the stop lacked the foundation necessary to support it, Hernandez says, he was wrongfully seized in violation of the Fourth Amendment.

4

The stop of a motor vehicle is a "seizure" of its occupants that must be conducted in accordance with the Fourth Amendment.[1]  A traffic stop is legal and comports with this Amendment if it is supported by probable cause to believe that a violation of law has occurred.[2]  An officer has probable cause to conduct such a stop when he observes any minor traffic violation.[3]

A traffic stop can also be justified by a lesser showing of "reasonable suspicion" under the *Terry*[4] standard.[5]  Officers making a *Terry* stop "must be able to articulate something more than a 'inchoate and unparticularized suspicion' or 'hunch.'"[6]  The Fourth Amendment requires some minimal level of "objective justification" for making the stop.[7]  Probable cause means "'a fair probability that contraband or evidence of a crime will be found,' and the level of suspicion required for a *Terry* stop is obviously less

---

[1] *See Brendlin v. California*, 551 U.S. 249, 255-59 (2007).

[2] *See Whren v. United States*, 517 U.S. 806, 810 (1996).

[3] *See United States v. Sallis*, 507 F.3d 646, 649 (8th Cir. 2007); *United States v. Bloomfield*, 40 F.3d 910, 915 (8th Cir. 1994) (en banc*)*.

[4] *Terry v. Ohio*, 392 U.S. 1 (1968).

[5] *See Heien v. North Carolina*, 574 U.S. 54, 60-61 (2014); *United States v. Winters*, 491 F.3d 918, 921 (8th Cir. 2007).

[6] *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (*quoting Terry,* 392 U.S. at 27).

[7] *INS v. Delgado*, 466 U.S. 210, 217 (1984).

demanding than for probable cause."[8]   There must be "a 'particularized and objective basis' for suspecting criminal activity at the time the stop is made."[9]

"Reasonable suspicion, like probable cause, is dependent upon the content of information possessed by [officers] and its degree of reliability.  Both factors – quantity and quality – are considered in the 'totality of the circumstances – the whole picture' that must be taken into account when evaluating whether there is reasonable suspicion."[10]  If the stop is not supported by reasonable suspicion or if officers exceed the proper scope of the stop, then any evidence derived from it must be excluded from trial.[11]

Other than intelligence that the owner/operator of the black SUV may have engaged in drug trafficking, there was nothing suspicious about the vehicle.  As the government acknowledges, Hernandez's stop was a probable cause one – premised solely on two alleged traffic violations: the lack of license plates and a cracked windshield.[12]  The Court therefore must examine the objective evidence (body camera footage and still shots from it) and witness testimony to determine whether there was a

---

[8] *Sokolow*, 490 U.S. at 7 (*quoting Illinois v. Gates*, 462 U.S. 213, 238 (1983)).

[9] *United States v. Spotts*, 275 F.3d 714, 718 (8th Cir. 2002).

[10] *Alabama v. White*, 496 U.S. 325, 330 (1990) (*quoting United States v. Cortez*, 449 U.S. 411, 417 (1981)).

[11] *See Wong Sun v. United States*, 371 U.S. 471, 484 (1963); *United States v. Wheat*, 278 F.3d 722, 726 (8th Cir. 2001).

[12] Docket No. 37 at 4.

basis to stop Hernandez and the SUV.  If no traffic violations occurred, then the Court

must evaluate whether Graff's mistaken conclusion to the contrary was objectively

reasonable.[13]

### 1.  Temporary Permits

Graff was in charge of this traffic stop and called the shots.[14]  Graff says that he

pulled Hernandez over for violating the license plate statute,[15] but eventually, decided to

write a warning for "improper display of the paper plates."[16]  South Dakota provides for

the operation of a newly purchased vehicle on a state highway for 45 days if the vehicle

has affixed temporary license permits in the interior of the front and rear windows.[17]

---

[13] *See Riley v. California*, 573 U.S. 373, 381 (2014) ("the ultimate touchstone of the Fourth
Amendment is 'reasonableness.'"); *Heien*, 574 U.S. at 60-61 (2014) (quoting *Brinegar v.
United States*, 338 U.S. 160, 176 (1949)) ("To be reasonable is not to be perfect, and the
Fourth Amendment allows for some mistakes on the part of government officials, giving
them 'fair leeway for enforcing the law and the community's protection.'"); *see also Heien*,
574 U.S. at 66 ("The Fourth Amendment tolerates only *reasonable* mistakes, and those
mistakes—whether of fact or of law – must be *objectively* reasonable").

[14] Mot. Hr'g Tr. 61, 77, 96 (Oct. 6, 2022).

[15] *Id.* at 17-18.

[16] Docket No. 30 Ex. 1 (Graff's Incident Report).

[17] *See* SDCL § 32-6B-26 ("a forty-five day license permit . . . . authorizes the operation of
the vehicle upon the highways of this state for a period of forty-five days after the date
of sale . . . ."); SDCL § 32-6B-27 (requiring temporary permits to "be affixed to the inside
windows, to the front at the lower right-hand corner of the windshield, and to the rear
on the lower left-hand corner of the rear window or to the lower rear portion of the left
rear window.").

Hernandez argues that since his vehicle had the proper temporary permits correctly displayed, Graff's faulty conclusion that Hernandez violated the license plate and temporary permit laws was an invalid reason for the stop.

In *Hollins*, the Eighth Circuit ratified a traffic stop (and subsequent search and arrest) based on a mistaken observation that a vehicle had no license plates or temporary permits.[18]  The officers observed no plates or permits until they approached the vehicle and shined a spotlight on it, at which time they noticed a valid "In Transit" permit was present.[19]  Even then, after the officers saw the permit in the window, the appeals court found that their experience with fraudulent temporary permits justified investigation of the permit's validity by checking the driver's license, registration, and insurance.[20]  According to the court, probable cause for the traffic stop did not dissolve when, after initiating the stop, the officers noticed the temporary permits and verified them.[21]

*Hollins*, though, is inapposite.  The officers in *Hollins* needed to approach the vehicle and use a spotlight to see the permits.  Here, before pulling Hernandez over, Graff and Lemke saw, or should have seen (based on the lighting conditions then and Graff being able to see a windshield crack), the front temporary license permit.  Graff also had

---

[18] *United States v. Hollins*, 685 F.3d 703, 706 (8th Cir. 2012).

[19] *Id.*

[20] *Id.* at 707.

[21] *Id.*

actual or apparent knowledge (through Lemke) of the rear permit. After Hernandez was stopped, Graff and Lemke – without inspecting their validity – used "improper display" of temporary permits as a reason to escort Hernandez to the Tahoe and detain him until Barstad could run Neko around the SUV. Hernandez's SUV could not be stopped on temporary permit or license plate grounds.

### a. The Front Permit

As Graff and Lemke (from a couple of blocks away) observed Hernandez back out of the driveway, they could not see the SUV's license plates or temporary permits.[22] The sun was just rising in Aberdeen at the time Graff and Lemke "paralleled" the SUV on a street one block to the north.[23] The duo met the SUV at an intersection and then followed it.[24] Graff testified that, as the SUV approached them at the intersection and passed them by, he did not observe the permit on display in the SUV's front windshield.[25] Lemke, in the front passenger seat of the Tahoe, also said he did not see the front permit when the SUV crossed in front of them.[26]

---

[22] Mot. Hr'g Tr. 13, 61.

[23] *Id.* at 13.

[24] *Id.*

[25] *Id.* at 17.

[26] *Id.* at 79.

The Court, however, finds it hard to believe that neither Graff nor Lemke could see the temporary permit on the front windshield's lower passenger-side corner. The permit is bright white paper with black block lettering. Graff claims he could see no part of the permit despite seeing, at one point, half to three-quarters of the windshield.[27] While the permit's spot on the slightly curved windshield was the furthest distance from Graff and Lemke's vantage, it was still far more apparent than the windshield crack Graff described in great detail and used as another basis for the stop. With the sun just coming up, the SUV's entire windshield would have been visible to Graff and Lemke as they waited for the vehicle at the intersection. And, as the body camera reflects, traffic that morning was not heavy enough to continuously obstruct their view. Willful blindness is not encompassed by the Fourth Amendment's "reasonable mistake" leeway. That Graff—alone—could make out the windshield crack but he and Lemke—together—never saw the front permit is difficult to fathom.

### b. The Rear Permit

When Graff turned and followed directly behind the SUV, he insisted that he did not know about the temporary license permit in the rear window because of the window tint and dirt coating.[28] But while Graff denied ever seeing the rear permit, Lemke testified

---

[27] *Id.* at 57.

[28] *Id.* at 17-18.

that, from 75 to 100 feet away, he *did* see the permit in the back window when Graff pulled out and followed the SUV.[29]  Lemke also said that he told Graff about the permit *before* Graff initiated the traffic stop.[30]  So, through his cohort seeing and telling him about it, Graff should have known, or at a minimum suspected, the SUV had temporary permits. Graff nevertheless went ahead and stopped the SUV because it did not have any license plates.

As the body camera reveals, the back window Graff characterized as being "dirty" merely had a light coat of dust on it with a clear area in the middle, where the rear wiper had been used, leaving only the window tint as a visual obstruction.[31]  The tint though did not violate any laws and is not alleged to.  Admittedly, the tinted windows made the rear permit harder to see.  But Hernandez was headed into the Cenex when Graff activated the Tahoe's emergency lights and was coming to a stop at a gas pump under a well-lit canopy.[32]  At least at that point, Graff should have seen the rear permit.

It is troubling that Graff stopped the SUV after Lemke told him of the temporary permit.  And it is tough to accept Graff's failure or refusal to give credence to what Lemke

---

[29] *Id.* at 74.

[30] *Id.* at 72.

[31] Mot. Hr'g Ex. A at 00:32 (Oct. 6, 2022).

[32] Docket No. 30 Ex. 2.

said and stop the SUV for not having any operational credentials when Graff had good reason to know, or believe, this was not true.

### c. Failing to inspect the permits

After Lemke, and at some point, Graff, acknowledged the existence of the temporary permits, no one at the scene bothered to check on their validity. Nothing in the record shows that Graff or Lemke ever looked into the legitimacy of the permits at all. Even if they did, state law[33] does not authorize officers to stop a vehicle exclusively to inspect temporary permits when they are correctly placed on the windows.

Graff says he saw the outline of the rear permit when he was 10-15 feet away from the SUV, but never tried to determine the authenticity of the permit.[34] The placement of the permit left at least the latter part of the expiration date visible from the outside: upon closer view anyone could see the permit expired on the 22nd of a month in 2022.[35] Enough of the permit was visible in the rear wiper swath to be assured that the permit had not expired.

---

[33] SDCL §§ 32-6B-26 and 27.

[34] Mot. Hr'g Tr. 37, 42-43.

[35] *Id.* at 74-75; Mot. Hr'g Ex. A at 00:32.

Nobody bothered to check on the completely unobstructed front permit either. When Lemke, acting as cover officer, approached the SUV and watched Hernandez from the vehicle's passenger side, he did not even look at the front permit.[36]

Rather than run a quick check on the temporary permits, Graff quickly whisked Hernandez into the Tahoe to write up warning citations.[37]  But warnings should not be written for complying with the law, and Graff admitted that the permits were in the right locations.[38]  Getting Hernandez out of the SUV cleared the way for Barstad to deploy Neko.  Graff had no vehicle credentialing justification to extract Hernandez from the SUV in the first place.  Any claim to the contrary is not credible or supported by the record evidence.

### 2. Cracked Windshield

Graff likewise claimed that he stopped Hernandez because of a cracked windshield.[39]  South Dakota law prohibits cracks, breaks, shatters, or distortions in vehicle glass that "significantly impair[] the vision of the motor vehicle operator."[40]  Hernandez admits his windshield was cracked, but maintains that no officer could

---

[36] Mot. Hr'g Tr. 72.

[37] *Id.* at 19-20.

[38] *Id.* at 28.

[39] Docket No. 30 Ex. 1.

[40] SDCL § 32-15-2.3.

reasonably believe it "significantly impair[ed]" his vision and that the crack could thus not be validly used as a reason to stop him.

The government cites *Foster* in response, where the Eighth Circuit approved a traffic stop launched because of the defendant's "unsafe windshield (several cracks)," even though photos showed that the crack "did not go all the way across the windshield nor did it obstruct the driver's view."[41]  Although the *Foster* court found the defendant did not violate the applicable Arkansas statute prohibiting "safety defects," it upheld the stop because an "officer's 'incomplete observations may give reasonable suspicion for a traffic stop,' even if subsequent examination reveals no traffic law violation."[42]

*Foster*, however, is distinguishable on at least two grounds.  First, South Dakota's statute is much more specific than Arkansas's general "safety defect" prohibition and requires there be (1) a crack, break, shatter, or distortion in the glass of a vehicle that (2) "significantly impairs" the driver's vision.  Not just any crack, therefore, will provide probable cause for a violation.  The crack must be a significant visual impairment for the driver.  Second, *Foster* is misaligned because officer credibility for the stop was not an issue in the case.  Here, it is.

---

[41] *United States v. Foster*, 15 F.4th 874, 876-77 (8th Cir. 2021).

[42] *Id.* at 877 (quoting *Hollins*, 685 F.3d at 706).

Graff stopped Hernandez in part because of the cracked windshield; he did so based on his belief that the crack "could impair" Hernandez's vision.[43]  Graff added that he believed the statute allowed him to stop a motorist who had a windshield crack that "severely hindered" the driver's vision.[44]  But there is no evidence that such a standard, which is not what the statute demands, was satisfied (or, for that matter, convincing proof Graff could reasonably determine that the crack severely hindered Hernandez's vision).

Graff's story about seeing the crack from the intersection is suspect.  Although Graff testified he believed the crack was a substantial impairment, he did so only when pressed on cross-examination and reminded of the statutory terms.  Graff said nothing in his report or on direct examination about the crack being anything more than an impairment.[45]  He likewise never produced the warning ticket (nor did the government) to support his claim that a law violation occurred and that he had probable cause to stop the vehicle under the cracked windshield statute.

A simple "impairment" of a vehicle windshield does not offend the statute.  Graff's belief that it does (which is the government's position) is unreasonable.  Even then, it is

---

[43] Mot. Hr'g Tr. 17.

[44] *Id.* at 40.

[45] *See* Docket No. 30-1 (acknowledging a cracked windshield but saying nothing about it being a substantial impairment); Mot. Hr'g Tr. 17 (testifying that the crack appeared to "be in the way" and "could impair" the driver's vision).

far-fetched to believe the crack in Hernandez's windshield was visible, much less that Graff could make a determination of significant impairment from 300 to 500, or even within 40 to 50, feet away, in a partly cloudy sunrise.[46]  To conclude otherwise would allow officers to stop a vehicle with any kind of perceived visual impairment (including a single windshield crack) whether or not the impairment (or crack) is significant.  Doing so is unreasonable and would countenance overreaching.

The peak of the crack is not a significant impairment to the driver's vision (especially for a driver Hernandez's size), being a singular mark that passes horizontally at a height just over the steering wheel.[47]  That said, Graff contends he could see the crack on the windshield one block away (500 feet he says;[48] 300 feet according to Lemke[49]) but could not see the temporary license permit (or any part of it) in the rear of the SUV while a trailing the vehicle at a much closer distance.[50]  Lemke, while in the Tahoe's passenger seat at the intersection as Hernandez passed by, never saw the crack – and was marginally nearer to the SUV than Graff.[51]  And Lemke still did not notice the crack when he walked

---

[46] *Id.* at 52, 71.

[47] Mot. Hr'g Ex. A at 06:49.

[48] Mot. Hr'g Tr. 51.

[49] *Id.* at 71.

[50] *Id.* at 17, 18.

[51] *Id.* at 70, 79.

around the front of the SUV and stood next to the passenger door of the vehicle acting as a "cover" for Graff.[52]  If the crack was apparent, then Lemke would have told someone about it.[53]  Until he reviewed his body camera footage, Barstad did not recall seeing a crack on the SUV's windshield either – at any time.[54]

There is no way Graff could have reasonably believed that the crack significantly impaired Hernandez's vision.  Graff's testimony – that he observed a discreet windshield crack while he sat at the intersection and watched the SUV for one block – conflicts with the body camera recording, Lemke and Barstad's testimony, and even Graff's own testimony that he did *not* see the much larger front temporary permit or later, the rear permit.  In short, what Graff claimed he saw or did not see was not credible.  His stop of Hernandez's SUV, for the supposed cracked windshield infraction, was objectively unreasonable.

## B. Expansion

Hernandez also argues that the traffic stop was extended beyond constitutional bounds.[55]  But because the stop was not justified from the start and tainted all evidence

---

[52] *Id.* at 79-82.

[53] *Id.* at 82.

[54] *Id.* at 100-101.

[55] Docket No. 49 at 12.

later obtained from Hernandez and the SUV, there is no need to address his alternative argument.

## C. Tainted Fruit

The legality of the stop depends on whether Graff's belief – that two traffic safety laws were violated – was objectively reasonable.  If there was no probable cause for the stop, then the stop was unlawful, and all evidence garnered afterward is fruit of the poisonous tree.[56]

Graff was just looking for a reason to pull Hernandez over.[57]  The crack and the absence of license plates (or a readable temporary permit) were all he could come up with.  He identified no other traffic violations or reasons to stop the SUV.  But Graff cannot rely on the lack of any license plates as a basis for the stop because Lemke told him the vehicle had a temporary permit in the rear window, and Graff saw, or should have seen, there was one in the front window too.  That Graff saw there was no front plate and could see up to three-quarters of the windshield, but did not see the front permit, is difficult to reconcile.

---

[56] *See Wong Sun*, 371 U.S. at 487-88.

[57] Mot. Hr'g Tr. 12.

It is also implausible that Graff could see the windshield crack when Lemke, who was closer and never noticed it, observed the SUV for a longer distance (1-2 blocks[58]) than Graff did (1 block[59]). Not even Barstad could say, after reviewing his body camera, that the crack was a significant impairment.[60]

Because the Hernandez traffic stop was unlawful, all evidence acquired from and as a result of the stop became tainted fruit and should be suppressed.

## CONCLUSION

The basis for Hernandez's traffic stop – unacceptably displayed permits (or missing license plates) and a crack in the windshield – is unfounded. In mustering up a reason to stop Hernandez and search for drugs, Graff unreasonably concluded that the windshield crack was a significant impairment to Hernandez's vision. And, with respect to the lack of license plates or "improper" display of temporary license permits, Lemke saw, and Graff should have seen, the correctly placed temporary permits before stopping Hernandez. A dissection of the objective evidence and in-court testimony establishes that Hernandez did not reasonably appear to be violating the temporary permit statute, and without more, Graff had no justification for pulling Hernandez over. The permits were

---

[58] *Id.* at 69-70.

[59] *Id.* at 30, 39-40, 50-51.

[60] *Id.* at 101.

visible, appeared genuine, and had not expired. Graff and his comrades could have quickly, and easily, confirmed the validity of the permits if he or those assisting him wanted to. But they focused on something else – making a drug bust. A laudable endeavor but only if done within the strictures of the Fourth Amendment. Hernandez's stop was not (because it was objectively unreasonable) and, as a consequence, all evidence seized from him and the SUV at the scene (drugs, gun, and cash) and obtained during his post-arrest interview (inculpatory statements) should be suppressed.

## RECOMMENDATION

Based on the authorities and legal analysis discussed in this report, the weight of the evidence before the Court, and the credibility of the witnesses who testified at the evidentiary hearing, it is

RECOMMENDED that Hernandez's Motion to Suppress[61] be granted.

## NOTICE

The parties consented to a three-business day objection period (agreeing to cut the prescribed two-week time[62]) to keep the upcoming trial on track. They thus have three working days after service of this report and recommendation to object to the same.

---

[61] Docket No. 29.

[62] *See* 28 U.S.C. §636(b)(1); Fed. R. Crim. P. 59(b).

Unless an extension of time for cause is later obtained,[63] failure to file timely objections will result in the waiver of the right to appeal questions of fact.[64]  Objections must "identify[] those issues on which further review is desired[.]"[65]

DATED this 22nd day of October, 2022.

BY THE COURT:

**MARK A. MORENO**
**UNITED STATES MAGISTRATE JUDGE**

[63] *See Thompson v. Nix*, 897 F.2d 356, 357 (8th Cir. 1990); *Nash v. Black*, 781 F.2d 665, 667 & n.3 (8th Cir. 1986) (*citing Thomas v. Arn*, 474 U.S. 140, 155 (1985)).

[64] *See Thompson*, 897 F.2d at 357; *Nash*, 781 at 667.

[65] *Arn*, 474 U.S. at 155.